FILED

2016 Sep-22  AM 10:02
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# NORTHWESTERN DIVISION

| | | |
|---|---|---|
| **ALISHA ALSUP,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. 3:15-cv-00248-CLS** |
| | ) | |
| **NORTHWEST SHOALS** | ) | |
| **COMMUNITY COLLEGE,** *et al.,* | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Alisha Alsup, commenced this action against the following defendants: Northwest Shoals Community College ("the College"), where she formerly was enrolled as a nursing student; Humphrey Lee, the President of the College; Shelia Smith, the Director of Nursing at the College; Ann M. Bales, a nursing instructor at the College; and Donna Roman-Jaynes, also a nursing instructor at the College. She alleged that those defendants violated her statutory rights under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the Americans with Disabilities Act of 1991, 42 U.S.C. § 12101 *et seq.* ("the ADA"), as well as her constitutional rights to due process and equal protection of the laws. She also asserted an independent claim for injunctive relief to remedy those alleged statutory

and constitutional violations.[1]  The case currently is before the court on defendants'

motion for summary judgment.[2]  Upon consideration of the motion, briefs, and

evidentiary submissions, the court concludes that the motion should be granted, and

that summary judgment should be entered in favor of defendants.

## I. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In

other words, summary judgment is proper "after adequate time for discovery and

upon motion, against a party who fails to make a showing sufficient to establish the

existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"In making this determination, the court must review all evidence and make all

reasonable inferences in favor of the party opposing summary judgment." *Chapman

v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v.

City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).  Inferences in favor of the non-

---

[1] *See* doc. no. 1 (Complaint).  Plaintiff also asserted claims against several fictitious
defendants, but, "[a]s a general matter, fictitious-party pleading is not permitted in federal court."
*Richardson v. Johnson*, 598 F.3d 734, 738 (11th Cir. 2010) (citing *New v. Sports & Recreation, Inc.*,
114 F.3d 1092, 1094 n. 1 (11th Cir. 1997)) (alteration supplied).

[2] Doc. no. 15.

moving party are not unqualified, however.  "[A]n inference is not reasonable if it is 'only a guess or a possibility,' for such an inference is not based on the evidence, but is pure conjecture and speculation."  *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983) (alteration supplied).  Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case.  The relevant rules of substantive law dictate the materiality of a disputed fact.  A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis and alteration supplied).  *See also Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

## II. FINDINGS OF FACT

Plaintiff, Alisha Alsup, began taking classes in pursuit of her Associate's Degree in Nursing at Northwest Shoals Community College ("the College") during the spring semester of 2011.[3]  She received and reviewed a copy of the College's Nursing Student Handbook, and she understood that she was subject to its policies

---

[3] Doc. no. 17-1 (Deposition of Alisha Alsup), at 45.

and requirements.[4]  Among other things, the Nursing Student Handbook contains a "Program Progression Policy," which provides that:

> In order to continue [*i.e.,* remain enrolled] in the nursing program, the student must:
>
> 1. Achieve a grade of C or better in all required general education and nursing courses and maintain a 2.0 cumulative GPA at NW-SCC. . . .
>
> 2. *Be accepted by clinical agencies for clinical experiences.*
>
> 3. *Earn a satisfactory clinical evaluation in all nursing courses with a clinical component.*
>
> 4. Maintain ability to meet essential functions for nursing with or without reasonable accommodations.
>
> 5. Maintain current CPR at the health care provider level.
>
> 6. Maintain an adequate level of health including but not limited to annual PPD, and freedom from chemical dependency and/or mental disorder.

Doc. no. 17-2 (Nursing Student Handbook), at ECF 50 (alteration, ellipsis, and emphasis supplied).  "Nursing non-progression is defined as failure (D, F, WF) of one or more courses in a semester OR withdrawal (W or WP) from one or more courses in two separate semesters."[5]

---

[4] *Id.* at 46.

[5] Doc. no. 17-2 (Nursing Student Handbook), at ECF 50. "ECF" is an acronym formed from the initial letters of the name of a filing system that allows parties to file and serve documents electronically (*i.e.*, "Electronic Case Filing").  Bluebook Rule 7.1.4 allows citation to page numbers generated by the ECF header.  *The Bluebook: A Uniform System of Citation*, at 21 (Columbia Law

A student may apply for reinstatement to the nursing program within one year of non-progression.[6]  The Reinstatement Policy states:

3.     In order to be eligible for reinstatement, the student must:

    a)     apply for readmission to the College if not currently enrolled;

    b)     receive unconditional admission status from the College;

    c)     demonstrate a 2.0 GPA in Nursing Program required courses completed at current institution;

    d)     have no more than one non-progression since program admission;

    e)     submit application requesting reinstatement to the Nursing Program by the following deadlines:

        Fall Semester – May 15

        Spring Semester – October 15

        Summer Semester – February 15

    f)     demonstrate the ability to meet essential functions for nursing with or without reasonable accommodations;

    g)     demonstrate competency in previous nursing courses by those students who have been out of progression for greater than one semester; (This may be evaluated by testing

---

Review Ass'n et al. eds., 19th ed. 2010).  Even so, the Bluebook recommends against citation to ECF pagination in lieu of original pagination.  Consequently, unless stated otherwise, this court will cite to the original pagination in the parties' pleadings.  When the court cites to pagination generated by the ECF header, it will, as here, precede the page number(s) with the letters "ECF."

    [6] *Id.*

and/or skills validation)

    h)    *be accepted by clinical agencies for clinical experiences*;

    i)    demonstrate current CPR certification at the Health Care Provider level;

    j)    adhere to nursing curriculum and/or program policies and procedures effective at the point of reinstatement; and

    k)    update all drug testing and background screening according to program policy.

4.    Students dismissed from the program for disciplinary reasons and or unsafe client care in the clinical area will not be allowed reinstatement to the nursing program.

5.    Reinstatement to the nursing program is not guaranteed and will be allowed only one time.

6.    *Reinstatement will be denied due to, but not limited to, any of the following circumstances*:

    a)    grade point average is less than 2.0 from courses completed at the current institution;

    b)    *refusal by clinical agencies to accept the student for clinical experiences*;

    c)    space unavailability; and or

    d)    more than twelve (12) months have elapsed since the student has enrolled in a nursing course.

Doc. no. 17-2 (Nursing Student Handbook), at ECF 50-51 (emphasis supplied).  The

Reinstatement Policy is followed by a note stating: "**Northwest-Shoals Community**

**College reserves the right to remove from the program any student who is**

**refused use of facilities by clinical agency** [*sic*]."[7]

The Nursing Student Handbook also contains a grievance policy, stating that:

A grievance is defined as a complaint for an act considered by an individual to be unjust or unfair. These acts may include but are not limited to a program policy/procedure; disagreement between student and faculty; or an issue between/among students. It is not the intent of this policy/procedure to usurp the College's grievance policy and procedure which is outlined in the Student Handbook located in the College Catalog.

Whenever an unjust act is perceived to have occurred, it is customary for the aggrieved individual to resolve the problem by following the chain of command. The chain of command in the Department of Nursing is:

- Faculty Member involved

- Course Leader

- Program Director/Co-Chair Health Studies– Nursing Division.

. . . .

Any unresolved issue following discussion with the Co-Chair Health Studies – Nursing Division will be handled at the direction of the Co-Chair and in accordance with grievance policies of the College which includes the opportunity to file a formal complaint.

The College Grievance Policy/Procedure specifically addresses grievances related to any form of discrimination (Title VII, Civil Rights Act of 1964), sexual harassment (Title IX of the Educational

---

[7] Doc. no. 17-2 (Nursing Student Handbook), at ECF 50-51 (all emphasis in original).

Amendments of 1972), and violation of the rights of the disabled (Section 504 of the Rehabilitation Act of 1973) or the Americans with Disabilities Act of 1999 [*sic*].  Please refer to the College's Student Handbook for additional/related information.

Doc. no. 17-2 (Nursing Student Handbook), at ECF 48-49 (ellipsis supplied).

The College's general student grievance policy states that:

Complaints will be handled as expeditiously as possible. Normally, complaints by students will be processed within 7 days of the written report up to a maximum of 30 days; however, the student will be notified in writing should the response require a longer evaluation.  The response will be made initially from the Department Head/Division Chairperson involved and then from either the Associate Dean of Students (student services issue) or the Vice President (academic issues).  The President of the College will make the final decision.

Doc. no. 18-5 (excerpts from Student Handbook), at ECF 66. The grievance policy

also directs that:

Any student who has a grievance against any other student or member of the College faculty, staff, or administration concerning any form of discrimination (Title VI, Civil Rights Act of 1964), sexual harassment (Title IX of the Educational Amendments Act of 1972), violation of the rights of the disabled (Section 504 of the Rehabilitation Act of 1973) or the Americans with Disabilities Act of 1999 [*sic*] should first attempt to resolve the matter with the individual involved.  If for some reason resolution of the grievance is not possible, the student should make his/her grievance known to the immediate supervisor of the individual against whom the student has a grievance, and/or to the Associate Dean of Students in order to seek informal resolution of the problem.

*Id.*

The policy also sets forth a series of formal procedures to follow in the event informal resolution is not possible, because "[s]tudents and members of the College faculty, staff, or administration are guaranteed procedural due process."[8]  Because plaintiff asserts that the College did not properly engage in the formal process outlined in the handbook and, thereby, denied her constitutionally adequate process, this court quotes the lengthy process in full:

I.      Responsibilities of the Associate Dean of Students

   A.   The Associate Dean of Students or his/her designee, as the representative of the President of the College, has the responsibility of officially convening the college Student Grievance Committee for the purpose of dealing with the acts of discrimination (Title VI), sexual harassment (Title IX), or violation of the rights of the disabled (Section 504). (NOTE:  In the event that a grievance is filed against the Associate Dean of Students, the Vice President of Instruction shall serve in lieu of the Associate Dean of Students in the procedural due process outlined.)  The Associate Dean of Students will convene the college Grievance Committee only after the following procedures have been implemented.

      1.   Grievance charges made by a student must be submitted to the Associate Dean of Students in writing.  The grievance must be signed and in as much detail as possible.

      2.   The Associate Dean of Students will notify the student or a member of the College faculty, staff, or administration of the charge(s) against him/her

_____

[8] Doc. no. 18-5 (excerpts from Student Handbook), at ECF 67 (alteration supplied).

within five days (excluding Saturday, Sunday, and holidays) of the hearing's conclusion.

    a.    The initial presentation may be verbal.

    b.    The Associate Dean of Students may suspend the student being charged, or the President of the College or his/her designee may suspend with pay the faculty member, staff member, or administrator being charged until a hearing is held and a decision rendered, if charges so warrant.

3.    The Associate Dean of Students may then schedule the time and location of the Grievance Committee session.

4.    If the student or member of the College faculty, staff, or administration who is charged with the grievance so desires, he/she may request a Grievance Committee hearing after initially meeting with the Associate Dean of Students.

B.    The Associate Dean of Students will make all reasonable attempts to notify the student or member of the College faculty, staff, or administration of the charges against him/her and provide the time, date, and location of the Student Grievance Committee hearing.

C.    If after a reasonable attempt to notify the student, faculty member, staff member, or administrator of the charges against him/her and of the date, time, and location of the Grievance hearing, and the Associate Dean of Students is unable to do so, then the student may be suspended. The President of the College or his/her designee may suspend with pay the faculty member, staff member, or administrator until a hearing is held and a decision

-10-

rendered.

D. The Associate Dean of Students will review the decision and recommendation(s) of the Student Grievance Committee.

1. The decision of the Grievance Committee shall be official when put into writing by the Associate Dean of Students.

2. The Associate Dean of Students, as deemed appropriate by the President of the College, shall implement the decision of the Student Grievance Committee.

3. A copy of the written decision will be forwarded to the President of the College and to the accused within five days (excluding Saturday, Sunday, and holidays) of the hearing's conclusion.

II. Rights of Students/College Employees

A. A student does not forfeit any of his/her constitutional rights upon his/her admission into the College.

B. A faculty member, staff member, or administrator does not forfeit any of his/her constitutional rights upon employment with the College.

C. A student or specific class of students who believe they have been subjected to sexual harassment or discrimination prohibited by Title VI, IX, or Section 504, of an act or regulation may file a grievance against an individual, as outlined in Part I.

D. The accused student may be advised by counsel of his/her choice during the Student Grievance Committee hearing.

-11-

No more than two counsel per accused may be present during a Grievance hearing.

E.    Refusal by the student to answer questions shall not be construed as an admission of guilt.

F.    The student may appeal the decision of the Student Grievance Committee to the President of the College (See Section IV for procedure.)

III.    Student Grievance Committee Composition and Responsibilities

A.    The Student Grievance Committee shall consist of five members appointed by the Associate Dean of Students.

B.    The Chairperson shall be the Associate Dean of Students or his/her designee.

C.    A quorum shall consist of four members and the chairperson.  The hearing may not be conducted without a quorum.

D.    All Student Grievance Committee hearings shall be confidential and closed to all persons except the following:

1.    The student or college employee

2.    Counsels [*sic*]

3.    Witnesses who shall:

i.    Give testimony singularly and in the absence of other witnesses;

ii.    Leave the committee meeting room immediately upon the completion of the testimony.

All hearings will be taped and minutes recorded. Tapes, hearing minutes, and evidence will become the property of the College and access to them will be determined by the Vice President. All hearing case files will be located and archived in the Office of the Associate Dean of Students.

E.    The decision reached by the Student Grievance Committee shall be by a majority vote.

F.    Within five (5) working days after the decision has been reached by the committee, the Chairperson of the Student Grievance Committee shall send a certified letter to the student or employee's last known address to provide written notification of the committee's decision.

G.    Decisions and recommendations will be forwarded to the Associate Dean of Students for official confirmation and implementation.

H.    Decisions and recommendations issued by the Student Grievance Committee shall be implemented within the confines of the laws of the State of Alabama and of the laws of the United States of America.

VI.   Right of Appeal

A.    The President of the College shall be the appeal authority in upholding, rejecting, or modifying the decision and recommendations of the institutional Student Grievance Committee.

1.    The charged student, faculty member, staff member, or administrator may file a written request with the Associate Dean of Students of the College requesting that the President of the College review the decision of the Student Grievance Committee.

-13-

      2.     The written request must be filed within five days (excluding Saturday, Sunday, and holidays) of the appeal.

    B.    If the decision of the Student Grievance Committee does not satisfy the complaint and should the grievance allege discrimination (Title VI), sexual harassment (Title XI), or violation of the rights of the disabled (Section 504), the complainant may file a written grievance with:

      1.     The Alabama State Board of Education as defined in Section 616, p. 104-105 of the State Policy and Procedure Manual.

      2.     The regional office of the Office for Civil Rights of the U.S. Department of Education within 180 days of the act.

      3.     The Equal Employment Opportunity Commission within 180 days of the decision issued by the institution.

    The College complies with non-discriminatory regulations under Title VI and Title VII of the Civil Rights Act of 1964; Title IX Education Amendment of 1972; and Section 504 of the Rehabilitation Act of 1973; and the Americans with Disabilities Act (ADA) of 1990.

Doc . no. 18-5 (excerpts from Student Handbook), at ECF 67-68.  The policy also provides contact information for the Associate Dean of Students.[9]

    Plaintiff successfully completed all of her coursework from the spring semester of 2011 through the fall semester of 2012.[10]  During the spring semester of 2013,

---

[9] Doc. no. 18-5 (excerpts from Student Handbook), at ECF 68.

[10] Doc. no. 17-1 (Deposition of Alisha Alsup), at 50-53.

which would have been her final semester in the Associate's Degree program, plaintiff was enrolled in two classes: Nursing 203 (Nursing Through the Lifespan III) and Nursing 204 (Role Transition for the Registered Nurse).[11]  Nursing 203 included both a classroom component and a clinical component. [12]  The clinical component of the course, which provided students with "hands on learning experience in the actual care of patients," was conducted at various external medical facilities, including hospitals, with which the College had clinical agreements.[13]  Despite the off-site locations, the clinical component of Nursing 203 still was supervised by an instructor from the College.[14]  The clinical component of Nursing 204, on the other hand, was supervised by a nurse preceptor at the hospital or other clinical agency at which the student was working.[15]

Plaintiff was assigned to perform the clinical component of her Nursing 203 course and the preceptorship component of her Nursing 204 course at Eliza Coffee Memorial Hospital ("Eliza Coffee") in Florence, Alabama.[16]   Sally Franks,  a

---

[11] *Id.* at 54.

[12] *Id.* at 49-54.  *See also* doc. no. 18-6 (Affidavit of Shelia Smith), at 1 ("Various courses in the NWSCC ADN program include both a lecture/classroom component and a clinical component.").

[13] Doc. no. 18-6 (Affidavit of Shelia Smith), at 1.  *See also* doc. no. 17-1 (Deposition of Alisha Alsup), at 48.

[14] Doc. no. 18-6 (Affidavit of Shelia Smith), at 2.

[15] *Id.*

[16] Doc. no. 17-1 (Deposition of Alisha Alsup), at 56-57; doc. no. 18-6 (Affidavit of Shelia Smith), at 3-4.

registered nurse employed at Eliza Coffee, served as plaintiff's nurse preceptor for Nursing 204.[17]

Plaintiff arrived at Eliza Coffee at approximately 6:00 p.m. on February 9, 2013, to begin a twelve-hour shift in connection with her preceptorship.[18]  Shortly after taking a meal break at 4:00 a.m. on February 10, she fainted while sitting at the break room table.[19]  Franks and other nursing personnel tended to plaintiff by checking her blood sugar, and then they took her to the emergency room, where she was attended by Dr. Frederick Epstein.[20]  The emergency room intake questionnaire stated that the reasons for the visit were slurred speech, high blood sugar, chest pain, and passing out.[21]  Plaintiff's urine tested positive for amphetamines and barbituates, although the emergency room records do not reflect the exact levels of each substance in her body.[22]  Plaintiff had valid prescriptions for medications containing both amphetamines and barbituates on February 10, 2013,[23] and she had provided a list of

---

[17] Doc. no. 18-6 (Affidavit of Shelia Smith), at 4.

[18] Doc. no. 18-10 (Affidavit of Sally Franks), at 1.  *See also* doc. no. 17-1 (Deposition of Alisha Alsup), at 26-27.

[19] Doc. no. 18-10 (Affidavit of Sally Franks), at 2.  *See also* doc. no. 17-1 (Deposition of Alisha Alsup), at 35.

[20] Doc. no. 18-10 (Affidavit of Sally Franks), at 2.  *See also* doc. no. 17-1 (Deposition of Alisha Alsup), at 35-36.

[21] Doc. no. 18-9 (Eliza Coffee Memorial Hospital Emergency Room Records), at ECF 21.

[22] *Id.* at ECF 23.

[23] Doc. no. 22-7 (Affidavit of Alisha Alsup), at 1.

her medications to one of her instructors at the College during January of 2013.[24]  A CT scan of plaintiff's brain and an x-ray of her chest were normal.[25]  Dr. Epstein's assessments upon plaintiff's release from the emergency room were syncope and polydrug intoxication.[26]  Plaintiff was discharged from the emergency room on February 10, 2013, at 8:25 a.m.[27]

A representative from Eliza Coffee informed Shelia Smith on February 22, 2013, that plaintiff would not be allowed to return to the hospital to complete the clinical or preceptorship components of any of her courses.  Ms. Smith asked to have that decision expressed in writing, and she mentioned to the Eliza Coffee representative that the hospital's decision would prevent plaintiff from being able to continue her coursework at the College.  Even so, Eliza Coffee decided to stand by its decision, and it memorialized that decision in writing on February 28, 2013.[28]

---

[24] Doc. no. 17-1 (Deposition of Alisha Alsup), at 45.

[25] Doc. no. 18-9 (Eliza Coffee Memorial Hospital Emergency Room Records), at ECF 25-26.

[26] Doc. no. 17-1 (Deposition of Alisha Alsup), at 35.

[27] *Id.*

[28] Doc. no. 18-6 (Affidavit of Shelia Smith), at 4; doc. no. 18-1 (Deposition of Shelia Smith), at 46-48. Plaintiff objects that the memorandum memorializing Eliza Coffee's decision to refuse plaintiff the right to access its facility was not signed or dated and, therefore, it cannot be authenticated.  That objection is not persuasive.  As an initial matter, the memorandum *is* dated February 28, 2013.  Moreover, the document states that it was sent from the Eliza Coffee Memorial Hospital Human Resources Department.  *See* doc. no. 17-2, at ECF 14 (February 28, 2013 memorandum).  Plaintiff has not explained why the memorandum would need to also be hand-signed, and even if it did, she has not explained why it could not be authenticated through an appropriate witness at trial.

Smith met with plaintiff on March 1, 2013, to inform her of Eliza Coffee's decision not to allow her to return to her preceptorship.  Smith advised plaintiff "that as a result of [Eliza Coffee's] decision she could not progress in the [Associate's Degree in Nursing] program."[29]  She also told plaintiff that "as a result of [Eliza Coffee's] decision she had 3 options, withdraw from her courses before March 18, 2013, which would allow [her] to preserve her grade point average, withdraw after March 18, 2013 and receive either a WP or WF, or not withdraw and receive an F."[30] Plaintiff asked if she could complete her preceptorship at another hospital so that she could earn the credits needed for graduation, but Smith said no.[31]  Even so, Smith acknowledged during her deposition that the College does not have a written policy stating that a nursing student who is denied access to one clinical site also will be denied access to all other clinical sites.[32]

Faced with the choices Smith had presented to her, plaintiff withdrew from all of her courses at the College on March 15, 2013.[33]  As a result, she was unable to graduate with her Associate's Degree in Nursing.[34]

---

[29] Doc. no. 18-6 (Affidavit of Shelia Smith), at 4 (alterations supplied).

[30] *Id.* at 4-5 (alterations supplied).

[31] Doc. no. 17-1 (Deposition of Alisha Alsup), at 80-81.

[32] Doc. no. 18-1 (Deposition of Shelia Smith), at 91-92.

[33] Doc. no. 18-6 (Affidavit of Shelia Smith), at 5.  *See also* doc. no. 17-1 (Deposition of Alisha Alsup), at 54.

[34] Doc. no. 22-7 (Affidavit of Alisha Alsup), at 1.

Plaintiff's attorney sent a letter to Shelia Smith, in her capacity as Director of Nursing Education for the College, on March 18, 2013. The attorney described the letter as an "appeal," and he requested that plaintiff be allowed to complete her nursing school curriculum.[35]

Plaintiff's attorney sent a second letter to Dr. Glenda Colagross, the College's Vice President of Instruction, on April 1, 2013, regarding plaintiff's "dismissal from the Northwest Shoals Nursing Program."[36] He noted that he had not received a response from Shelia Smith to his March 18th letter, and further stated:

> It is my understanding that you are the person to whom any further appeal must be taken. We are, therefore, requesting an appeal hearing before you in regard to Ms. Alsup's termination from nursing school. It is my understanding that you are not only legally authorized to conduct such a hearing, but that you are legally mandated to do so.
>
> Please contact me at the address or telephone number shown below so that we may schedule this meeting as soon as possible. I look forward to hearing from you.

Doc. no. 22-9 (April 1, 2013 letter from Steve R. Graham to Dr. Glenda Colagross), at 1.

Dr. Colagross responded to plaintiff's attorney by letter dated April 3, 2013. She stated:

---

[35] Doc. no. 22-8 (March 18, 2013 letter from Steve R. Graham to Shelia Smith). *See id.* at 8 ("I look forward to hearing from you in regard to our requested *appeal*.") (emphasis supplied).

[36] Doc. no. 22-9 (April 1, 2013 letter from Steve R. Graham to Dr. Glenda Colagross), at 1.

Ms. Alisha Alsup was not dismissed from the Northwest-Shoals Nursing Program.   After an incident which occurred during her preceptor experience at ECM Hospital, the College received a letter from the hospital exercising their right to refuse the use of their facility to Ms. Alsup for any further clinical experience.  *The College has an agreement with all of its clinical sites that if a student is removed from any clinical site, that particular student will not be sent to another site to complete their clinical experience.*  After receiving the letter from the hospital, Ms. Sheila [*sic*] Smith, the Director of Nursing at Northwest-Shoals, met with Ms. Alsup and discussed her options which were to either remain in the courses and receive a failing grade because she would not be able to complete her clinical experience or to withdraw from the courses and receive a grade of 'W' if she withdrew before the deadline (March 18, 2013) after which a grade of "WF" (withdrawal failing) would have to be assigned.  During that meeting Ms. Smith also reviewed with Ms. Alsup her academic progress in the two nursing courses up to that point in the semester, and based on her grades in the two courses up to that point and the fact that she could not be placed back in a clinical facility, Ms. Smith suggested to her that she withdraw from her courses rather than remain enrolled because a grade of 'W' does not affect a student's GPA (grade point average) in a negative manner like a grade of 'F' or 'WF' would affect it.

Ms. Alisha Alsup voluntarily withdrew from her nursing courses, NUR 203 and NUR 204, on March 15, 2013 and received a grade of 'W' in both courses which did not negatively affect her GPA.  If Ms. Alsup had chosen to remain in the courses and receive 'F's, the College would have dismissed her from the program at that point.

Whether a student voluntarily withdraws from all courses or the student is dismissed from the Program by the College, according to the Student Handbook for the Northwest-Shoals Nursing Program, the Program Progression Policy list[s] six standards that must be met.  The first standard states that a student must achieve a grade of 'C' or better in all required general education and nursing courses and maintain a 2.0 cumulative GPA, and the second standard states that a student must be accepted by clinical agencies for clinical experiences.  Thus, in order to

> return to the Nursing Program, Ms. Alsup has up to one year to follow
> the Reinstatement Policy for which the steps are outlined in the Nursing
> Handbook, however, one of the requirements in this policy is to 'be
> accepted by clinical agencies for clinical experiences.'

Doc. no. 22-10 (April 3, 2013 Letter from Dr. Glenda Colagross to Steve R. Graham),

at 1-2 (alterations and emphasis supplied).

On August 2, 2013, plaintiff, through a different attorney, served upon Dr.

Humphrey Lee, the College's President, a document entitled "Grievance/Complaint."

The Grievance set forth the circumstances leading to plaintiff no longer being a

student in the Nursing Program, and it set forth three "Counts" of the type that would

be found in a judicial complaint:  *i.e.,* (1) "Section 504 of the Rehabilitation Act of

1973"; (2) "Due Process"; and (3) "Equal Protection."[37]

By letter dated August 29, 2013, Tom Carter, the College's Assistant Dean of

Recruitment, Admissions and Financial Aid, informed plaintiff that he had reviewed

her grievance, but concurred with Shelia Smith's decision.  Carter also informed

plaintiff of her right to appeal his decision by responding to his letter within five

days.  He stated:  "Your appeal will be reviewed by the College disciplinary

committee.  Please review the college student handbook for the disciplinary appeals

process."[38]

---

[37] Doc. no. 22-11 (Grievance/Complaint).

[38] Doc. no. 22-12, at ECF 1 (August 29, 2013 letter from Tom Carter to Alisha Alsup).

Plaintiff's attorney sent Carter a letter on September 5, 2013, providing notice of plaintiff's appeal of the decision announced in his August 29 letter.  Plaintiff requested a hearing on the appeal.[39]

Charles T. Taylor, the College's Associate Dean of Students, sent plaintiff a letter on September 12, 2013, acknowledging receipt of her appeal, and informing her of a "Grievance Committee meeting" to hear her appeal on September 24th. Taylor also attached copies of pages from the College's student handbook that discussed the grievance process.[40]  The hearing later was rescheduled twice at the request of plaintiff's attorney.  It eventually took place on November 5, 2013.[41]

Plaintiff testified during her deposition that the College followed its student grievance policy in addressing her grievance.  She was represented by counsel during the hearing, and she was allowed to present whatever evidence she wanted in support of her grievance.[42]

Following the hearing, Taylor sent plaintiff a letter on November 12, 2013, stating:

---

[39] *Id.* at ECF 2 (September 5, 2013 letter from James Irby to Tom Carter).

[40] Doc. no. 22-13 (September 12, 2013 letter from Charles T. Taylor to Alisha Alsup), at ECF 1.

[41] *See* doc. no. 22-14 (October 17, 2013 letter from Charles T. Taylor to Alisha Alsup); doc. no. 22-15 (October 29, 2013 letter from Charles T. Taylor to Alisha Alsup); doc. no. 22-16 (November 12, 2013 letter from Charles T. Taylor to Alisha Alsup).

[42] Doc. no. 17-1 (Deposition of Alisha Alsup), at 104-05.

> After a careful review of the evidence presented, the committee voted to deny your request for readmission into the Northwest-Shoals Community College Nursing Program.  If you disagree with this decision, you may contact me and request that the President of the College review the decision of the Student Grievance Committee.

Doc. no. 22-16 (November 12, 2013 letter from Charles T. Taylor to Alisha Alsup). Plaintiff responded to Taylor's letter on November 19, 2013, requesting a review of the Grievance Committee's decision by the College's President.[43]  College President Humphrey Lee sent plaintiff a letter on November 21, 2013, stating:  "After careful review of all of the documents related to the grievance filed by you against Northwest-Shoals Community College, I uphold with [*sic*] the decision made by the Grievance Committee."[44]

### III. DISCUSSION

It is difficult to decipher the arguments plaintiff has made in response to defendants' motion for summary judgment.  To the extent that she is attempting to raise an independent state law claim based upon the Alabama Supreme Court's decision in *Mustell v. Rose*, 211 So. 2d 489 (Ala. 1968), she may not do so for the first time in her response brief.  *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1313 (11th Cir. 2004) ("The central issue in this case is whether a non-moving

---

[43] Doc. no. 22-17 (November 19, 2013 letter from James Irby to Charles T. Taylor).

[44] Doc. no. 22-18 (November 21, 2013 letter from Dr. Humphrey Lee to Alisha Alsup), at ECF 1.

party plaintiff may raise a new legal claim for the first time in response to the opposing party's summary judgment motion. We hold it cannot.").

Moreover, plaintiff's response brief does not mention anything about the Rehabilitation Act, the ADA, or the constitutional right to equal protection, despite defendants' well-supported arguments that summary judgment should be granted on each of those claims.   The effect of plaintiff's failure to address defendants' arguments is detrimental:  issues and contentions not raised in a party's brief are deemed abandoned.  *See, e.g.*, *Chapman v. AI Transport,* 229 F.3d 1012, 1027 (11th Cir. 2000) (*en banc*) ("Parties opposing summary judgment are appropriately charged with the responsibility of marshaling and presenting their evidence before summary judgment is granted, not afterwards."); *Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994) (holding that a district court can "properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment") (citing *Lazzara v. Howard A. Esser, Inc.*, 802 F.2d 260, 269 (7th Cir. 1986) (holding that a ground not pressed in opposition to a motion for summary judgment is to be treated by the district court as abandoned)).

> In opposing a motion for summary judgment, a party may not rely on his pleadings to avoid judgment against him.  There is no burden on the district court to distill every potential argument that could be made

-24-

based upon the materials before it on summary judgment. Rather, the
onus is upon the parties to formulate arguments; grounds alleged in the
complaint but not relied upon in summary judgment are deemed
abandoned. . . .

*Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (citations
and internal quotation marks omitted).

Thus, the only claims that remain for this court's consideration are plaintiff's
claims for due process and injunctive relief.

## A.    Due Process

It is unclear whether plaintiff intended to assert a claim for her rights to
substantive due process, procedural due process, or both.[45]   Out of an abundance of
caution, the court will address both.

### 1.    Procedural due process

The Due Process Clause of the Fourteenth Amendment provides
that a state shall not "deprive any person of life, liberty, or property,
without due process of law." U.S. Const. amend. XIV, § 1. "[A] § 1983
claim alleging a denial of procedural due process requires proof of three
elements: (1) a deprivation of a constitutionally-protected liberty or
property interest; (2) state action; and (3) constitutionally-inadequate
process." *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003).

*J.R. v. Hansen*, 736 F.3d 959, 965 (11th Cir. 2013) (alteration in original). Even

---

[45] Plaintiff's complaint is no help. She states only that she "has been made to suffer a
violation of her rights to Due Process as provided for under the First and Fifth Amendments to the
Constitution of the United States as made applicable to the states by the Fourteenth Amendment to
the Constitution of the United States." Doc. no. 1 (Complaint), ¶ 59.

assuming that plaintiff had a constitutionally protected property interest in her continued enrollment at the College,[46] she was provided constitutionally adequate process before she was deprived of that interest.

The College disputes that plaintiff was *dismissed* from the nursing program, and asserts, instead, that she *chose* to withdraw.  For purposes of the present analysis, however, the court will credit plaintiff's counter-argument that she was left with no real choice but to withdraw, and that her withdrawal thus effectively amounted to a dismissal.  In any event, plaintiff's non-continuance in the nursing program was for academic, as opposed to disciplinary, reasons:  *i.e.*, her inability to gain access to the necessary facilities to complete her clinical requirements.  *See, e.g., Ekmark v.*

---

[46] It is not entirely clear whether the Eleventh Circuit recognizes such an interest.  The Eleventh Circuit held in *Barnes v. Zaccari*, 669 F.3d 1295 (11th Cir. 2012), that "no tenet of constitutional law is more clearly established than the rule that a property interest in continued enrollment in a state school is an important entitlement protected by the Due Process Clause of the Fourteenth Amendment.") (citing *Goss v. Lopez*, 419 U.S. 565, 574, 576 n. 8 (1975)).  The *Barnes* court had already determined that the school's student handbook and code of conduct created a legitimate claim of entitlement to continued enrollment.  A similar conclusion could be reached here, because the handbook states that "[s]tudents and members of the College faculty, staff, or administration are guaranteed procedural due process."  Doc. no. 18-5 (excerpts from Student Handbook), at ECF 67 (alteration supplied).

In a subsequent unpublished decision, however, the Eleventh Circuit observed that "[t]he Supreme Court has not addressed whether students have a constitutionally-protected liberty or property interest in continued enrollment at public educational institutions." *Rollins v. Bd. of Trustees of the Univ. of Alabama*, No. 14-14882, 2016 WL 1399375, *15 (11th Cir. Apr. 11, 2016) (alteration supplied).  It is not necessary to decide whether those two panel decisions are in conflict, and if so, which one should control.  Instead, this court, like the Eleventh Circuit ultimately did in *Rollins*, will simply assume that a protected property right exists and move on to evaluate whether plaintiff was provided constitutionally adequate process.  *See id.* at *15 (stating that the Supreme Court typically "presume[s] the existence of such a right") (alteration supplied).

*Matthews*, 524 F. App'x 62, 63-64 (5th Cir. 2013) ("Bready and Matthew's

determination that Ekmark was unable to fulfill the clinical residency requirements,

and was thus unqualified for certification, was academic in nature.").

> [A] student dismissed from a public educational institution for
> academic reasons is entitled to less process than a student dismissed for
> disciplinary reasons. *Haberle v. Univ. of Ala.*, 803 F.2d 1536, 1539
> (11th Cir.1986).  In fact, the Constitution does not require schools to
> hold formal hearings for academic dismissals.  *Id.*; *see also Bd. of
> Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 90, 98 S. Ct. 948,
> 955, 55 L. Ed. 2d 124 (1978).  Procedurally, however, a school is
> required to engage in a "careful and deliberate" decision-making
> process. *Haberle*, 803 F.2d at 1539 (quoting *Horowitz*, 435 U.S. at 85,
> 98 S. Ct. 948).  As the Supreme Court explained in *Horowitz*, 435 U.S.
> at 91, 98 S. Ct. 948, "[b]y and large, public education in our Nation is
> committed to the control of state and local authorities." (internal citation
> and quotation marks omitted) Courts are reticent to intrude on that
> historic control. *Id.*

*Rollins v. Board of Trustees of the University of Alabama*, No. 14-14882, 2016 WL

1399375, at *5 (11th Cir. Apr. 11, 2016) (first alteration supplied, second alteration

in original).

Thus, the relevant question is *not* whether the College precisely followed its

grievance procedures, or even whether it provided plaintiff with the most thorough

process possible.  Instead, the court must ask whether the College met the more

minimal standard of providing plaintiff with a "careful and deliberate" decision-

making process.  It unquestionably did.  In fact, plaintiff received much more than the

minimum.   She received a full administrative hearing, during which she was represented by counsel and had the opportunity to present evidence.

Plaintiff's only complaint about the process provided to her is that the hearing was delayed "for 190 days."[47]  The date that fell 190 days before November 5, 2013 (the date of the hearing) was April 29, 2013.  It is difficult to discern the significance of that date, because nothing related to plaintiff's grievance occurred then.  Instead, plaintiff first sent a letter to Shelia Smith on March 18, 2013, and then another letter to Dr. Colagross on April 1.  Plaintiff did not immediately receive a hearing, but Dr. Colagross considered plaintiff's claims and responded on April 3, two days after the second letter, by explaining that plaintiff had not been *dismissed* from the nursing program, and informing plaintiff's attorney of plaintiff's obligation to follow the Reinstatement Policy if she wanted to be considered for readmission to the nursing program.  Plaintiff did not take any additional action until August 2, 2013, *four months later*, when she served a formal Grievance on College President Humphrey Lee.  Tom Carter, the Assistant Dean of Recruitment, Admissions and Financial Aid, responded to her request on August 29th, stating that he agreed with the decision to remove plaintiff from the nursing program, and notifying plaintiff of her right to

---

[47] Doc. no. 22 (Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment), at ECF 16 ("A reasonable jury could conclude that the actions of NWSCC in denying Alsup a hearing for 190 days in clear violation of their written policy constituted a denial of due process.")

appeal to the College disciplinary committee.  When plaintiff exercised that right on

September 5, 2013, the Grievance Committee scheduled a hearing for September 24,

less than three weeks later.  The fact that the hearing was delayed for 43 days, or until

November 5th, was not the fault of the College; it was the result of plaintiff's requests

for continuances.  In fact, of the 190 days about which plaintiff complains, 139 days

were the result of plaintiff's own delay or inaction.[48]

Moreover, even if plaintiff did suffer a violation of her procedural due process

rights, that violation would not be actionable in federal court because the Alabama

state courts provide an adequate remedy.  The Eleventh Circuit has held that

> "only when the state refuses to provide a process sufficient to remedy
> the procedural deprivation does a constitutional violation actionable
> under section 1983 arise." [*McKinney v. Pate*, 20 F.3d 1550, 1557 (11th
> Cir. 1994) (*en banc*)].  It is the state's failure to provide adequate
> procedures to remedy the otherwise procedurally flawed deprivation of
> a protected interest that gives rise to a federal procedural due process
> claim. *See id.; see also Bass v. Perrin*, 170 F.3d 1312, 1319 (11th Cir.
> 1999); *Harris v. Board of Educ.*, 105 F.3d 591, 596 (11th Cir. 1997).
> This rule (that a section 1983 claim is not stated unless inadequate state
> procedures exist to remedy an alleged procedural deprivation)
> recognizes that the state must have the opportunity to "remedy the
> procedural failings of its subdivisions and agencies in the appropriate
> fora — agencies, review boards, and state courts" before being subjected
> to a claim alleging a procedural due process violation. *See McKinney*,

---

[48] Ninety-six days passed between April 29, 2013 (the date that falls 190 days before
plaintiff's hearing date), and August 2, 2013 (the date on which plaintiff, through her new attorney,
submitted a formal Grievance to the College President). An additional 43 days passed between
September 24, 2013, plaintiff's original hearing date, and November 5, 2013, the date on which the
hearing finally was held after being continued twice at plaintiff's request.

20 F.3d at 1560; *see also Horton v. Board of County Comm'rs*, 202 F.3d 1297, 1300 (11th Cir. 2000).

> Assuming a plaintiff has shown a deprivation of some right protected by the due process clause, we — when determining if a plaintiff has stated a valid procedural due process claim — look to whether the available state procedures were adequate to correct the alleged procedural deficiencies. *See McKinney*, 20 F.3d at 1563; *see also Bell v. City of Demopolis, Alabama*, 86 F.3d 191, 192 (11th Cir. 1996); *Narey v. Dean*, 32 F.3d 1521, 1527-28 (11th Cir. 1994).  If adequate state remedies were available but the plaintiff failed to take advantage of them, the plaintiff cannot rely on that failure to claim that the state deprived him of procedural due process. *See McKinney*, 20 F.3d at 1565 ("The fact that [McKinney] failed to avail himself of the full procedures provided by state law . . . does not constitute a sign of their inadequacy."); *Bell*, 86 F.3d at 192; *Narey*, 32 F.3d at 1528.  And, to be adequate, the state procedure need not provide all the relief available under section 1983. *See McKinney*, 20 F.3d at 1564.  Instead, the state procedure must be able to correct whatever deficiencies exist and to provide plaintiff with whatever process is due.

*Cotton v. Jackson*, 216 F.3d 1328, 1330-31 (11th Cir. 2000) (first alteration supplied, second alteration in original).  As defendants pointed out in their reply brief, "Alabama's writ of certiorari provides an adequate post deprivation remedy for a procedural deprivation."[49]  *See Bell v. City of Demopolis*, 86 F.3d 191, 192 (11th Cir. 1996).  *See also Cotton*, 216 F.3d at 1331 ("We agree with Defendant that certiorari is generally an adequate state remedy.").

## 2.   Substantive due process

---

[49] Doc. no. 32 (Defendants' Reply Brief in Support of Motion for Summary Judgment), at 4.

> Substantive due process includes both the protections of most of the Bill of Rights, as incorporated through the Fourteenth Amendment, and also the more general protection against "certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." [*Zinermon v. Burch*, 494 U.S. 113, 125 (1990)] (quoting *Daniels v. Williams*, 474 U.S. 327, 331, 106 S. Ct. 662, 665, 88 L. Ed. 2d 662 (1986)) (internal quotation marks omitted); *see also Collins v. City of Harker Heights*, 503 U.S. 115, 125, 112 S. Ct. 1061, 1068, 117 L. Ed. 2d 261 (1992).

*DeKalb Stone, Inc. v. County of DeKalb, Georgia*, 106 F.3d 956, 959 (11th Cir. 1997).

Plaintiff does not allege the violation of one of her fundamental constitutional rights, nor could she, because there is no fundamental right to a public education. *See San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 33-39 (1973) (elementary and secondary school); *Federov v. Board of Regents of University of Georgia*, 194 F. Supp. 2d 1378, 1391 (S.D. Ga. 2002) (post-secondary school). Instead, she asserts that the College's decision to not allow her to continue in the nursing program violated her substantive due process rights because it was arbitrary, capricious, and made in bad faith. That argument also is foreclosed by Eleventh Circuit case law.  In *Greenbriar Village, L.L.C. v. Mountain Brook City*, 345 F.3d 1258, 1263 (11th Cir. 2003), while addressing a municipality's denial of a land-disturbance permit, the Court stated:

Greenbriar contends that the City's action with respect to its Permit was

> unconstitutionally irrational and arbitrary, and that the substantive component of the Due Process Clause protects generally against arbitrary and irrational action by the government.  We specifically discussed the dangers of broadening the scope of substantive due process in this fashion in *McKinney*. *See* 20 F.3d at 1559; *see also DeKalb Stone*, 106 F.3d at 959 n. 6, 960.  According to *McKinne*y, non-legislative deprivations of state-created rights, which would include land-use rights, cannot support a substantive due process claim, *not even if the plaintiff alleges that the government acted arbitrary* [*sic*] *and irrationally*. 20 F.3d at 1559. Constitutional due process is satisfied for these deprivations when proper procedures are employed. *Id.*

*Greenbriar Village*, 345 F.3d at 1263 (emphasis supplied).[50]  In other words, such a claim is more appropriately analyzed under the framework of *procedural* due process, not *substantive* due process.  As discussed above, the College employed proper procedures before making a final determination that plaintiff could not continue in the nursing program.

Moreover, even if plaintiff could rely upon a theory of arbitrary and capricious

---

[50] The decision not to allow plaintiff to continue in the nursing program was of an executive, not a legislative nature.  As the Eleventh Circuit observed in *McKinney v. Pate*, 20 F.3d 1550, 1557 (11th Cir. 1994):

> Executive acts characteristically apply to a limited number of persons (and often to only one person); executive acts typically arise from the ministerial or administrative activities of members of the executive branch.  The most common examples are employment terminations, *e.g., Roth*, 408 U.S. at 5066, 92 S. Ct. at 2703. . . .

> Legislative acts, on the other hand, generally apply to a larger segment of — if not all of — society; laws and broad-ranging executive regulations are the most common examples.

*McKinney*, 20 F.3d at 1557 n.9 (ellipses supplied).  The decision not to allow plaintiff to continue in the nursing program applied only to her.

decisionmaking to support her substantive due process, there is no evidence to support such a theory.  "[O]nly the most egregious official conduct can be said to be 'arbitrary in the constitutional sense . . . .'"  *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998), *abrogated on other grounds by Saucier v. Katz*, 533 U.S. 194 (2001) (quoting *Collins v. Harker Heights*, 503 U.S. 115, 129 (1992)) (alteration supplied). Plaintiff asserts that defendants' decision was arbitrary and capricious because there is not a "written policy holding that [a] student barred from one facility is then barred from all other preceptorship cites [*sic*]."[51]  It is true that there is no written policy, but the absence of such a writing hardly indicates arbitrary and capricious behavior.  To the contrary, it seems entirely reasonable, not arbitrary or capricious, that the College would not want to jeopardize its working relationships with clinical sites, or its reputation in the health care community, by arranging preceptorships for students who have been rejected by other facilities. Moreover, the nursing handbook explicitly states that the College reserves the right to remove from the program any student who is refused use of facilities by a clinical agency, and it makes acceptance by clinical agencies a condition of reinstatement for any student who has been dismissed.

In summary, plaintiff cannot proceed on her claims for either procedural or substantive due process, and summary judgment must be granted on both those

---

[51] Doc. no. 22 (Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment), at ECF 15 (alterations supplied).

claims.

## B.     Injunctive Relief

Summary judgment also must be granted on plaintiff's claim for injunctive

relief.  As the Eleventh Circuit has stated:

> any motion or suit for a traditional injunction must be predicated upon
> a cause of action, such as nuisance, trespass, the First Amendment, etc.,
> regarding which a plaintiff must show a likelihood or actuality of
> success on the merits.  There is no such thing as a suit for a traditional
> injunction in the abstract.  For a traditional injunction to be even
> theoretically available, a plaintiff must be able to articulate a basis for
> relief that would withstand scrutiny under Fed. R. Civ. P. 12(b)(6)
> (failure to state a claim).  *See, e.g., Paisey v. Vitale*, 807 F.2d 889, 892
> (11th Cir. 1986) ("[T]he district court did not err in denying [the
> plaintiff's] motion for a preliminary injunction and dismissing the
> injunctive count of [the plaintiff's] complaint because [the plaintiff] has
> failed to state a claim for relief. . . .").
>
> Considering the issue from another perspective, a traditional
> injunction is a remedy potentially available only after a plaintiff can
> make a showing that some independent legal right is being infringed —
> if the plaintiff's rights have not been violated, he is not entitled to any
> relief, injunctive or otherwise.

*Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1097-98 (11th Cir. 2004)

(alterations and ellipses in original).  Because there is no remaining cause of action

upon which plaintiff can proceed past summary judgment, plaintiff also cannot

proceed on her claim for injunctive relief.

## IV. CONCLUSION AND ORDER

In accordance with the foregoing, it is ORDERED that defendants' motion for summary judgment is GRANTED, and all of plaintiff's claims are DISMISSED with prejudice.  Costs are taxed to plaintiff.  The Clerk is directed to close this file.

DONE this 22nd day of September, 2016.

_____
United States District Judge